**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MASTERPAGE COMMUNICATIONS, INC.,**

                                **Plaintiff,**

**v.**                                                                          **1:02-CV-888**
                                                                                **(NAM/DRH)**


**THE TOWN OF OLIVE, NEW YORK, THE TOWN**
**OF OLIVE TOWN BOARD, BERNDT LEIFELD,**
**Supervisor, LINDA BURKHARDT, HELEN CHASE,**
**CINDY JOHANSEN and BRUCE LAMONDA, in**
**their capacity as members of Town Board of the Town**
**of Olive, THE PLANNING BOARD OF THE TOWN**
**OF OLIVE, THE BUILDING INSPECTOR OF THE**
**TOWN OF OLIVE, and THE CODE ENFORCEMENT**
**OFFICER OF THE TOWN OF OLIVE,**

                                **Defendants.**
_____

**APPEARANCES:**                                           **OF COUNSEL:**

Young, Sommer Law Firm                              J. Michael Naughton, Esq.
Executive Woods
5 Palisades Drive
Albany, NY 12205
*For Plaintiff*

Kerr & Weiss, Esqs.                                        James H. Kerr, Esq.
15 Plattekill Avenue
New Paltz, New York 12561
*For Defendants*

Norman A. Mordue, D.J.:

## MEMORANDUM-DECISION AND ORDER

### I.       INTRODUCTION

       This action stems from plaintiff Masterpage Communication, Inc.'s application for a

special use permit to build a wireless telecommunications facility in Olive, New York.  The

complaint alleges that the Town of Olive, New York, the Town of Olive Town Board, Berndt

Leifeld, Supervisor, Linda Burkhardt, Helen Chase, Cindy Johansen and Bruce Lamonda, in

their capacity as members of Town Board of the Town of Olive, the Planning Board of the

Town of Olive, the Building Inspector of the Town of Olive, and the Code Enforcement Officer

of the Town of Olive, collectively defendants or the Town, violated the Federal

Telecommunications Act, 47 U.S.C. § 332 ("TCA") and 42 U.S.C. § 1983 in their processing

and *de facto* denial of Masterpage's application to construct and operate a wireless

telecommunications facility ("the facility") in the Town of Olive.  Masterpage advances five

causes of action.  Count 1 alleges that defendants unreasonably delayed the  processing of

Masterpage's application to construct a wireless communications facility and tower, in violation

of 47 U.S.C. § 332(c)(7)(B)(ii).  Count 2 alleges that defendants actions have, in effect,

prohibited Masterpage from providing wireless services to the Town of Olive, in violation of 47

U.S.C. § 332(c)(7)(B)(i)(II).  Count 3 alleges that defendants' *de facto* denial of its application

was not supported by substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii).  Count 4

alleges that defendants' failure to grant Masterpage a special use permit is arbitrary and

capricious and not supported by substantial evidence, in violation of Article 78 of the New York

Civil Practice Law and Rules and Section 274-a of the New York Town Law.  Count 5 alleges

defendants' actions deprived Masterpage of its constitutionally protected rights, and violated the

TCA in violation of 42 U.S.C. § 1983.  Masterpage seeks injunctive relief directing defendants

to issue all approvals and permits necessary to construct and operate the wireless

communications facility and, pursuant to § 1983, an award of the costs, disbursements, and

expenses of this action, including attorneys' fees.  Presently before the Court is Masterpage's

2

motion for summary judgment.  Defendants oppose Masterpage's motion.

## II.    FACTS

The following facts are, unless otherwise noted, undisputed.  Masterpage is licensed by the Federal Communications Commission ("FCC") to provide wireless communication services. It provides service, installation, and equipment for personal, business, and emergency two-way radio communication throughout Ulster County, New York.  In April 1999, Masterpage obtained a site-specific license from the FCC to provide wireless communications services, in this case a paging service, through a facility it planned to construct on South Mountain in the Town of Olive, which is located in Ulster County.  According to Masterpage, Olive has no wireless telecommunications facility and radio frequency tests revealed large gaps in wireless and cellular coverage.

Masterpage planned to construct its facility on a ten acre site located on South Mountain that it leased from Susan and Gregory Desanna.  There is a hunting cabin on the site and, according to Masterpage, may be accessed by a right of way that traverses at least one other property.   Notwithstanding both parties' repeated referral to the "access road" throughout the record, defendant Leifeld claims in an affidavit that there "may be" a right of way, but denies that the path can support any vehicles.  The site was formerly part of a larger parcel of land that the Desannas subdivided and sold sometime prior to entering the lease.  The site is located in the R/C-10A zone, which permits, *inter alia*, "Commercial radio, television and other similar electronic transmission structures", Town of Olive Zoning Ordinance, section 321.1(m).  When, however, the Town Planning Board approved the subdivision of the property, it directed that the ten acre site be used for "recreational" purposes only.  Because there was an issue as to whether

3

the road could accommodate emergency vehicles, this designation relieved the Town of its obligation to provide emergency services to the site.  There is no evidence, however, that plaintiff or defendants were aware of this designation until almost a year after Masterpage filed its application.

On June 23, 1999, Masterpage attempted to file an application for a special use permit to construct a 180' wireless telecommunications tower on South Mountain.  Since a moratorium against the filing of applications to construct, and the construction of, wireless facilities, was in effect, the Town refused to accept the application.  The Town issued the moratorium in June 1998 in order to write and enact local legislation regarding the siting of wireless facilities.  On July 6, 1999, despite the Town's refusal to accept its application, Masterpage presented its plans to construct a wireless communications facility at a Town Board meeting.  Council member Bruce Lamonda advised Masterpage that its proposed facility was subject to the moratorium and that it should apply at the end of the moratorium under the auspices of the new law.

On July 6, 2000, the Town Board enacted "A Local Law Regulating the Siting of Wireless Telecommunications Facilities" (the "Tower Law") and ended the moratorium.  The Tower Law empowered the Town Board to review and act upon applications for special use permits to site and construct wireless telecommunications facilities in the Town.

On August 23, 2000, Masterpage filed an application for a special use permit[1] pursuant to the newly enacted Tower Law for a special use permit to construct a wireless

---

[1]A Special Use Permit, as defined by the Wireless Telecommunications Facilities Siting Law for the Town of Olive, means "the official document or permit granted or issued by the Town by which an Applicant is allowed to construct and use Wireless Telecommunications Facilities."  Section 4.

4

telecommunications facility on South Mountain.  Masterpage proposed to build an initial tower

structure of 142', and indicated that its "ultimate intention" was to construct a "182' tower to

collocate[2] an additional 4 to 6 wireless carriers."  The application included FCC licenses, a State

Environmental Quality Review Act ("SEQRA") Full Environmental Assessment Form with

visual addendum, a Proposed Site Plan, and Viewshed Maps.  In its application, Masterpage

requested that the Town Board waive the requirement that the proposed wireless facility be "set

back" from adjoining properties a distance equal to its height, and allow the proposed facility to

be "set back" a distance of 10' from the adjoining property, which is owned by the New York

State Department of Environmental Conservation ("DEC").  In addition, Masterpage submitted

a $5,000 application fee and agreed to fund an escrow account to pay for consultants to assist

Town in considering Masterpage's application.

On September 22, 2000, Masterpage's representatives met with Richard Comi of Comi

Telecommunications Services/Monroe Telcom Associates.  Comi assisted the Town in drafting

the Tower Law and was the Town's consultant on Masterpage's application.

On October 25, 2000, Masterpage flew two weather balloons at heights of 142' and 182'

at the proposed site and provided Comi with photographs of the balloon tests.  On November 8,

2000, Masterpage supplemented its application with documents Comi had requested.

On November 13, 2000, Masterpage's counsel made a presentation regarding

Masterpage's application at a Town Board meeting.  At the meeting, OLIVE Cares, a

"neighborhood group", voiced its concern.  The Town Board held a "special workshop" on

---

[2]Collocation means "the use of the same telecommunications tower or supporting
structure to carry two or more antenna for the provision of wireless services by 2 or more
persons or entities."  Tower Law, Section 4.

November 20, 2000, to meet with representatives from OLIVE Cares and discuss the construction of wireless communications facilities.

The Town Board held a "special informational meeting" on December 4, 2000, regarding Masterpage's application and announced that a second balloon test to evaluate the potential visual and aesthetic impacts of the proposed facility was scheduled for January 6, 2001.

On December 5, 2000, the Town Board noted that a hunting cabin was located on the proposed site and that there would be a change in use of the property if Masterpage constructed a wireless facility there.

On December 12, 2000, the Town Board held an emergency meeting to discuss entering a contract with Daniel Shuster, of Shuster & Associates to handle the SEQRA process with regard to Masterpage's application and insure that all the planning and SEQRA requirements were met.

On December 28, 2000, the Town Board held a meeting at which it discussed Masterpage's request for a waiver of the set back requirement.  The Town Board noted that the waiver should not be granted unless the DEC, as the adjoining property owner, consented to the construction of the proposed wireless facility 10' from its property line.

On January 2, 2001, the Town Board met and discussed the set back issue, and whether other wireless providers would be interested in utilizing the proposed tower.

In a letter dated January 14, 2001, Masterpage's attorney wrote to the Town Supervisor that Comi had stated he would recommend that the Town Board grant the set back waiver given the proposed tower's isolated location, Masterpage's execution of a hold harmless agreement

for the benefit of the Town, and the substantial insurance Masterpage was required to acquire naming the Town and its officers and boards as additional insureds.

In a memorandum to the Town Board dated January 22, 2001, Shuster outlined several issues he had gleaned from reviewing Masterpage's application, including: (1) whether adjacent municipalities had received copies of the application pursuant to the Tower Law; (2) whether the height provisions of the Zoning Ordinance, which limit the height of a building to 35' or the provisions of the Tower Law, which limit height to 140', apply to Masterpage's application; (3) whether the ultimate height of the proposed tower, 182' is adequately justified; (4) whether Masterpage has explained why it did not propose to build the tower on other sites of "higher priority" as designated by the Tower Law; (5) whether Masterpage has demonstrated that its proposed facility is sited so as to have the least visual effect on the environment; (6) what the height, color and materials of the three equipment sheds to be constructed near the facility would be; and (7) whether improvements to the access road will result in tree removal, which would increase visibility.

On January 22, 2001, the Town Board held a "special workshop meeting" to discuss the recent balloon test.  Shuster displayed a map and photographs of the balloon test showing the zone of visibility of the proposed tower.  The Town Board approved utilizing six views where the balloon was visible to create a visual simulation of the proposed tower.  The Town Board also addressed the issues Shuster raised in his memorandum and directed Shuster to present them to Comi and Masterpage.  The Town Board again discussed Masterpage's request for a set back waiver.  The meeting minutes indicate that Supervisor Leifeld advised Masterpage's attorney that the application would not progress until the set back issue had been addressed.

In a letter dated February 23, 2001, Masterpage replied to the matters Shuster raised in the memorandum dated January 22, 2001.  Masterpage: (1) stated that it had provided copies of its application to the adjacent municipalities; (2) asserted that the provisions of the Tower Law, which permitted a height of 140', not the more restrictive height provisions of the Zoning Ordinance, applied; (3) stated, with regard to the height of the tower:

> Masterpage is requesting, also with Mr. Comi's concurrence, to build only a 122 foot tower, with 20 foot receive antennas on top, which will bring the total height of the facility to 142 feet.  Masterpage is not, as implied by Mr. Shuster's comments, requesting to build a 182 foot tower.  If Masterpage builds a 142 foot facility and at some point thereafter seeks to enlarge its tower, then pursuant to [the Tower Law], it must justify the additional height before the Town Board and obtain its approval.

Dkt. n.21, Appendix 1, p.A-66[3]; (4) explained its rationale for seeking a "ten foot setback variance" and noted that Comi concurred; (5) articulated the basis for the proposed height of the tower and antennas; (6) discussed why other sites in the Town of Olive would not suffice; (7) addressed the construction of the sheds; and (8) stated that improvements to the access road "will not result in any tree removal which will increase the road's visibility."

On March 6, 2001, the Town Board addressed the above letter from Masterpage's counsel.  At the meeting, the Town Board noted that Masterpage had not discussed with them whether there was, as Masterpage claimed, a significant gap in wireless coverage.  The Town Board also addressed Masterpage's request for a waiver of the set back requirement and noted that Masterpage would need the DEC's consent to its request for a waiver of the set back requirement.   The Town Board agreed to discuss the set back issue with Comi and "learn what

---

[3]Appendix 1 is a record of the proceedings before the Town as submitted by plaintiff. Docket number 30 is a record of the proceedings before the Town as submitted by defendant.

he has told the applicants."

In a letter dated March 13, 2001, Peter Case Graham, the Town's attorney, advised the Town Board as follows: "The Town Zoning Law establishes a maximum height of 35 feet in the R/C A Zone (Section 322). The [Tower Law] establishes a maximum height of 140 feet (Section 9B). This conflict is resolved by adopting the standard 'which is more restrictive or protective of the Town and the public.' Therefore, 35 feet is the maximum height for structures in the Town of Olive."

In a Memorandum to the Town Board dated March 20, 2001, Shuster outlined "some additional steps which should be taken prior to action on the application." Shuster stated that Masterpage had not yet justified its request to build a 140' tower, and that any justification must be based on an "analysis that the proposed height of the tower is the minimum necessary to achieve adequate coverage." Shuster stated that Masterpage would need to seek a waiver of the 35' height limit in view of Attorney Graham's opinion that the Zoning Ordinance limits the height of the facility to 35'. Shuster further stated that although "a number of issues remain to be resolved", the "application appears to be complete for the purpose of scheduling a public hearing".

In a letter dated March 23, 2001, an attorney for Sam and Delia Adams, whose property the "proposed access road to the proposed tower site crosses", notified Supervisor Leifeld that the Adams' opposed the construction of the tower and that although they permitted the "woods road for access to the cabin . . . for some time", Masterpage had no "deeded right" to use their property for access purposes.

On March 27, 2001, the Town Board held a "special workshop" to address "legal

9

questions" regarding Masterpage's application.  With regard the height issue and the conflict

between the Tower Law and the Zoning Ordinance, Attorney Graham reiterated his opinion that

the Zoning Ordinance, as the more restrictive, applied, but that Masterpage could seek "height

relief" through the procedure set forth in the Tower Law and that the Town Board was the

"appropriate authority" to grant such relief.  With regard to the height of the proposed tower,

Comi stated that 142' is the "minimum height necessary" and that if the structure were any

shorter "it would not cover the community."  The Town Board also discussed the set back issue.

Comi stated that he met with the DEC, that the DEC was considering the issue.  Comi advised

the Town Board that "based on federal law the Town could not sit on this issue."  Attorney

Graham stated, with regard to a "reasonable length of time", that if the Town Board does not

hear from the DEC, then it should make a decision.

The Town Board also addressed the letter regarding the right of way from the attorney

of the adjoining property owners.  Attorney Graham informed the Town Board that the issue

"must be resolved between the property owner and the applicant" before the Town Board could

proceed further on the application.  The Town Board directed Attorney Graham to send a letter

to Masterpage stating that the "right of way issue with the neighbor" and the set back issue with

the State needed to be addressed before the Town Board could take further action.

In a letter to Supervisor Leifeld dated March 31, 2001, Comi explained that

Masterpage's request to construct a 142' tower was justified because a shorter tower would not

provide adequate coverage.[4]  A-85.

---

[4]Masterpage contends that it has justified the need to construct a 182' facility based on an affidavit by Carl J. Grabala, who has provided technical assistance to Masterpage throughout the application process.  That evidence, however, was not submitted to the Town Board.  Indeed,

At a Town Board meeting on April 3, 2001, Supervisor Leifeld acknowledged that the issue regarding the right of way was one between the land owners and Masterpage, but stated that the Town Board could not proceed on Masterpage's application until the issue was resolved because "the property owner must have legal access to the site" for a building permit to be granted.

In a letter dated May 8, 2001, the DEC wrote to the Town Board that it would not object if the Town permitted Masterpage to build a tower closer to the State's property line than present Town Law allowed so long as Masterpage provided liability insurance.  The DEC further stated that its staff had reviewed the visual analysis and concluded that the visual impact of the proposed tower was "not significant."

In a letter dated July 30, 2001, to the Town Board, Robert Allison of Rettew Engineering, P.C., advised that the survey he prepared regarding the "right of way for access to the lands of Susan Desanna" comported with the report prepared by Freer Abstract, which was attached to the letter.  Masterpage asserts that the title report evidenced its legal right to utilize the access road.  Although the Adams' repeatedly claimed Masterpage had no right of way through their property, they did not submit any evidence in support of that claim to the Town Board.  Likewise, the Town continues to maintain there is an issue of fact as to whether Masterpage has legal access to the site, but has not cited any evidence in support of that

---

counsel for Masterpage conceded to the Town Board that while Masterpage had justified the need for a 142' facility, should other wireless providers decide to collocate on the facility and consequently increase the height of the facility, those providers would need to apply to the Town Board.  Accordingly, resolving all disputed issues of fact in favor of defendants, as it must on summary judgment, the Court assumes the justified height is, as defendants contend, 142' - such a dispute, however, is not an impediment to summary judgment on the issue of unreasonable delay.

assertion.

On August 2, 2001, the Town Board conducted a public hearing, at which a number of local residents voiced their concerns about the proposed facility.  One local resident questioned the subdivision which created the site and asked the Town Board to look into the subdivision approval.

In a letter dated August 11, 2001, to the Town Attorney, Masterpage objected to the Town Attorney's assertion that the 35' height limit contained in the Zoning Ordinance applied to its proposed facility, and argued that telecommunications towers were exempt from the height limit in the Zoning Ordinance (section 315.03), and that construing the Zoning Ordinance to limit telecommunications towers to a height of 35' was "absurd".

In a letter dated August 16, 2001, to Supervisor Leifeld, Masterpage responded to the issues raised at the public hearing.  With regard to public concern about the height of the facility,  Masterpage stated that the Town's consultant had recommended the facility be 142'.  Masterpage asserted that an abstract company had fully reviewed and approved the legality of the right of way.  Masterpage indicated that it had already submitted a detailed environmental assessment form, and that it had analyzed the impact construction of the facility would have on the endangered species and the two plant species in the area and determined that there would be no impact.  As for the visual impact of the tower, Masterpage stated it would be built in an unpopulated area and painted to blend in with the surroundings, and that the DEC had noted "that the visual impact of the proposed tower as it may be seen from public lands managed by this department is not significant".  Masterpage stated that there was no evidence that its facility would reduce property values, and that the DEC had no objection to its request for a set back

12

waiver.  Finally, Masterpage asserted that there were no alternative sites of higher priority, as defined by the Tower Law, available, explaining that "there are no existing telecommunications towers or facilities, or tall structures within the Town" on which it could situate its antenna, and that the "town-owned properties are low elevation and are in more populated areas, making these locations undesirable and unpopular."  Masterpage requested Supervisor Leifeld place its response in the public file and circulate it to the Town Board members.

On August 23, 2001, the Town Board conducted a "special meeting" and adjourned to "executive session" to "discuss potential legal concerns regarding the . . . public hearing comments on the application for a wireless radio facility proposed by Masterpage Communications, Inc.".  After reconvening, the Town Attorney asked the Town Board members to submit their individual concerns regarding the public hearing comments to him in writing by August 31, 2001.

On September 5, 2001, the Town Board forwarded its list of concerns regarding the public hearing comments to the Town Attorney and requested that he send the list to Masterpage.   By memorandum dated September 20, 2001, Shuster recommended that the Town Board ask Masterpage to provide alternate transmission coverage mapping at different facility heights or consider approving "a conditioned negative declaration [i.e. that the proposed facility would not have a significant adverse impact on the environment and is therefore not subject to review under SEQRA] based on a specified maximum facility height lower than 142 feet" or approving "a positive declaration [i.e. that the proposed facility would have a significant adverse impact on the environment] with the requirement that a Draft Environmental Impact Statement (DEIS) be prepared to evaluate alternative means to provide service to the

Town."

In a letter dated October 1, 2001, the Town Attorney advised Supervisor Leifeld as follows:

> You have requested that I record whether the applicant must apply to the Town of Olive Planning Board for a modification of the subdivision approval because the property is no longer being used as a hunting cabin.
>
> In my opinion, the applicant, as agent of the property owner, or the owner of the property must return to the Town of Olive Planning Board for a modification to address the new potential use.

A-147.  In a letter dated October 8, 2001, Masterpage objected to the Town Board's instruction that it return to the Planning Board for a modification to address the new use of the property.

On October 5, 2001, Masterpage received a letter from the Town Attorney containing a list of twenty-six "concerns expressed at the public hearing," regarding Masterpage's application, including the height of the facility and the basis for the height of the facility, alternative locations for the facility, the subdivision issue, property values, whether emergency service organizations were interested, ambient tree height, the visual impact of the facility on neighbors, improvements to the access road, environmental issues, whether Masterpage had legal access to the site, and  road maintenance agreement.

In a letter dated October 9, 2001, Masterpage objected to the list of concerns on the basis that it had already sent the Town Board its written responses to many of the issues. Masterpage nevertheless addressed each concern.

In November 2001, the Town Board directed the Planning Board to issue a "recommendation" regarding the application and, in particular, the access issue.  On December 11, 2001, the Planning Board conducted a meeting, at which the Chairman of the Planning

14

Board stated that when the Desanna subdivision was approved, the right of way was for "recreational use".  Counsel for Masterpage asserted that the site is zoned RC/10 and that permitted uses under that section "include Section M commercial radio, television and other similar electronic transmission structures."  The Chairman stated that the site was deemed for recreational use because it relieved the town "of the fact that it is not open to emergency vehicles".  Counsel for Masterpage responded that Masterpage will "maintain the road as it is today."  The Chairman replied "then it is out of the hands of the planning board" and instructed Masterpage to file a road maintenance agreement.  Counsel for Masterpage agreed.  In a letter dated December 12, 2001, Masterpage requested that the Planning Board return its application to the Town Board.

On December 18, 2001, the Town Board held a "Special Meeting" with the Planning Board to discuss the Desanna subdivision and to inform the Planning Board that the Town Board was redirecting the Desanna subdivision to it for review and a recommendation.  The Town Attorney stated that the Planning Board would have to address the access issue as well.

On January 15, 2002, the Planning Board conducted a public hearing regarding the Desanna subdivision.  Several residents expressed their opposition.  At the hearing, Masterpage's attorney stated that its proposed use would not require accessibility for emergency service vehicles because the proposed facility would be monitored from a remote location, would not be staffed, and that someone would be there less than once a month to check the equipment.

In a letter dated January 29, 2002, Masterpage's attorney wrote the Chairman of the Planning Board to repeat Masterpage's position that its proposed use of the Desanna property

15

will require no improvements to the access road, or different access than that which is currently provided to the site.

The Town Board met on February 5, 2002, and addressed the status of the Masterpage application, but took no action because they were waiting for the Planning Board's recommendation regarding the subdivision and the road maintenance agreement, and noted that there were still "outstanding issues" Masterpage needed to address.

In a letter dated February 13, 2002, the Planning Board wrote to the Town Board recommending, with regard to the Desanna subdivision, that Masterpage re-apply to the Planning Board to remove the "recreational use" restriction, at which point the Planning Board would ask the Town Board to declare the subdivision an Open Development District.  An Open Development District requires a 50' right of way with a road maintenance agreement approved by the Town Highway Superintendent and signed by affected property owners.  The Planning Board stated that Masterpage would also have to provide proof of right of way over crossed properties.

In a letter dated March 11, 2002, the Town Attorney wrote to Masterpage and the attorney representing the individuals who disputed Masterpage's right of way to offer them the opportunity to "upgrade the quality of your submissions" regarding the right of way issue.  IN the letter, the Town Attorney advised that the Town Board would "act based upon the facts and opinions duly presented."

In two letters dated March 26, 2002, Masterpage wrote the Town Board complaining about the delay in deciding the application, demanding a vote, and advising the Board that its consideration of the right of way issue was contrary to New York Law.

On April 2, 2002, the Town Board held a meeting at which it addressed Masterpage's March 26, 2002, letter.  Supervisor Leifeld stated that the Town Attorney had advised Masterpage that it needed to "return to the Planning Board to revisit the subdivision."  In a letter dated April 2, 2002, the Town Attorney responded to Masterpage's letter and stated that the issues regarding the subdivision of the site, the access road to the site, and whether Masterpage has legal access to the site were all raised at the public hearing, were serious ones, and that the Town must address them.  The Town Attorney further stated that the Town Board would take a "hard look" at Masterpage's environmental impact statement.  This action followed.

## III.    DISCUSSION

### A.    Summary Judgment Standard

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id.*  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See id.*

### B.    The Telecommunications Act

The Telecommunications Act of 1996, 47 U.S.C. § 151, was enacted to:

provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition . . . .

17

H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124.  To this end, Congress enacted 47 U.S.C. § 332©)(7), "which limits the state and local government's authority to deny construction of wireless telecommunications towers, and regulates how such decisions must be made."  *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (internal citations omitted).  In regulating the manner in which decisions on an application for authorization to construct a wireless facility are made, the TCA specifies that state and local governments must act on such a request "within a reasonable period of time after the request is made."  47 U.S.C. § 332(c)(7)(B)(ii).  Although the TCA "preserves local zoning authority in all other respects over the siting of wireless facilities", *id.*, it provides that state and local regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(I).  A plaintiff that is "adversely affected by any final action or failure to act by a State or local government" that is inconsistent with these provisions may commence an action "within 30 days after such action or failure to act."  47 U.S.C. § 332(c)(7)(B)(v).[5]

### C.    Unreasonable Delay

Masterpage claims that defendants failed to act on its application to construct a wireless

─────────────

[5] The last recorded action by the Town Board in this case (excepting some later correspondence from the City of New York Department of Environmental Protection to the Town Attorney, and a statement at the July 2, 2002, Town Board meeting that Masterpage had not yet resolved the subdivision issue) occurred on April 2, 2002, when the Town Attorney wrote Masterpage and addressed the subdivision issue, the issue of legal access to the site, and the potential environmental impact of the facility.  Masterpage filed suit on July 8, 2002, and has not specified a precise date on which it believes its cause of action - based on the Town's alleged failure to act - accrued.  Since defendants did not plead or raise the statute of limitations as an affirmative defense, it is deemed waived.  *See Chimblo v. Commissioner of Internal Revenue*, 177 F.3d 119, 125 (2d Cir. 1999) ("As a general matter, the statute of limitations is an affirmative defense that must be pleaded; it is not jurisdictional.").

facility in a timely manner.  The TCA provides, in relevant part:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

47 U.S.C. § 332(c)(7)(B)(ii).  Congress implemented the "reasonable period of time" provision of the TCA to "'stop local authorities from keeping wireless providers tied up in the hearing process' through invocation of state procedures, moratoria, or gimmicks." *Lucas v. Planning Bd. of Town of LaGrange,* 7 F.Supp.2d 310, 321-22 (S.D.N.Y. 1998) (quoting *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 50 (D.Mass. 1997)).

Masterpage contends that the moratorium, which lasted more than two years, the Town's failure to hold a public hearing within 62 days after it received Masterpage's application for a special use permit to build a wireless facility and failure to vote on its application within 62 days after the public hearing, as required by § 274-b of New York Town Law, which governs special use permits, and the Town's "pattern of delay" which was meant "to defeat the Project through attrition", violates the TCA's requirement that local governments take action on an application within a "reasonable period of time".

In opposition, the Town argues that it has not violated the TCA because the length of the moratorium was reasonable, the time limits in § 274-b are inapplicable because the Tower Law, which contains no specific time limits, governs Masterpage's application for a special use permit, and that Masterpage must apply to the Planning Board for reconsideration of the recreational use restriction placed on the site as a condition to subdivision.

### 1.     Moratorium

19

The Town enacted the moratorium and approved subsequent extensions in order to:

provide a period of time to accommodate the study, preparation and adoption of any necessary amendments to the Town's zoning regulations in order to prevent the unrestricted proliferation or concentration of such telecommunications towers and to assure that they are constructed pursuant to the [TCA], as amended as well as in a manner that will not adversely affect the health, safety and economic well-being of the community.

Appx.3, Ex.E.   The moratorium lasted from June 1998 until July 2000, and prevented Masterpage from applying for a special use permit for more than a year.  In *Sprint Spectrum, L.P. v. City of Medina*, 924 F.Supp. 1036, 1039-40 (W.D. Wash. 1996), the court found a six-month moratorium was reasonable because the City imposed the moratorium days after the TCA was enacted in anticipation of a number of applications and in order to process pending applications for wireless facilities, and study the feasibility of co-location.  Here, the Town imposed the moratorium to enact new legislation governing wireless communications facilities more than a *year* after the enactment of the TCA.  Further, the moratorium lasted more than two years, and prohibited Masterpage from applying for more than one year.  While the Town asserts that it needed the time to prepare the law, it extended the moratorium at least once without explanation.  *See e.g.* Appx.3, Ex.E. April 22, 1999 Town Board "workshop meeting".  Thus, the delay was unreasonable in violation of the TCA.  *See Sprint Spectrum L.P. v. Town of Farmington*, 3:97 CV 863(GLG), 1997 WL 631104 (D.Conn. Oct. 6, 1997) (finding moratorium which prohibited the plaintiff "from constructing a telecommunications facility, or even submitting an application for approval, for 270 days" violates the TCA).  The moratorium, however, has long since expired.  Had Masterpage sought relief from the Court during the moratorium, based on the above law, it may have been entitled to relief directing the Town to entertain its application.  Masterpage, however, waited until after the moratorium expired, and

20

is therefore without relief.

### 2.    Public Hearing on Masterpage's Application

Masterpage next asserts that the Town failed to hold a public hearing within sixty-two days of its filing an application, and failed to vote on its application within sixty-two days of holding a public hearing in violation of § 274-b of the New York Town Law, and thus violated the reasonable time provision of the TCA.  In its defense, the Town claims that the Tower Law, which does not contain a specific time provision, not § 274-b, governs special use permit applications to construct wireless facilities.  Further, there is some evidence in the record that the public hearing was delayed one month pursuant to Masterpage's request.  *See* Dkt.30.  Even assuming the sixty-two day time period is applicable, because the Town held a public hearing, and Masterpage sought no relief between day 63 and the public hearing, there is no relief the Court can grant at this point to remedy that delay.

### 3.    Vote on Masterpage's Application

Masterpage's strongest argument pertains to the Town Board's allegedly unreasonable delay in voting on Masterpage's application filed August 23, 2000, an action that the Town Board has not, to date, taken.  Masterpage asserts that the Town engaged in a pattern "of excuses, moratoria, gimmicks and hurdles" in order to delay Masterpage's plans to construct a wireless facility.  Specifically, Masterpage contends that the Town unreasonably delayed its application by referring its application to the Planning Board for resolution of the issue regarding the site's recreational use restriction.

The Tower Law authorizes the Town Board to "delegate or designate other official agencies of the Town to accept, review, analyze, evaluate, and make recommendations to the

Board with respect to the granting or not granting . . . [of a] special use permit for Wireless Telecommunications Facilities."  Tower Law, Section 6.A.  Indeed, the TCA "preserves local zoning authority in all respects over the siting of wireless facilities."  47 U.S.C. § 332(c)(7)(B)(ii).  Even so, the TCA requires the Town Board to act within a reasonable time period.

The issue regarding the recreational use restriction was raised in August 2001. The Planning Board did not addressed the issue until December 2001.  Though "research" unearthed this issue following the public hearing, there is nothing in the record that explains why there was a four month interval between the time the issue was raised, and the time the Planning Board addressed it.  Further, at the first Planning Board meeting regarding the subdivision, Masterpage assured the Planning Board that its use of the site would not be significantly different from the current use, and that it would file a road maintenance agreement.  Based upon that assurance, the Chairman stated that the issue was "out of the hands of the Planning Board".  Six days later, the Town Board called a "special meeting" to direct the Planning Board to "revisit" the subdivision and access issues for a second time.  In February 2002, six months after the issue was first raised, the Planning Board held a public hearing on the change in use of the subdivision, and, upon considering the issue for the second time, recommended to the Town Board that Masterpage apply to the Planning Board for a change in use of the subdivision.

The reasonability of the Town Board's second referral of the subdivision and access issues is questionable since the Planning Board seemed satisfied with Masterpage's assurance that its use of the property would not be significantly different from the current use and that it would file a road maintenance agreement.  Even viewing the facts in the light most favorable to

defendants, however, the Town Board's subsequent insistence that plaintiff return to the

Planning Board for the third time to seek "reconsideration and re-approval of the subdivision",

was unreasonable.  First, although the Tower Law empowers the Town Board to request a

recommendation from the Planning Board, it does not contain a provision which would

authorize the Town Board to direct an applicant to apply to the Planning Board for a change in

use of the subdivision.  Second, the Tower Law specifically provides that the Town could have

denied Masterpage's application on the basis that the proposed use was contrary to the use for

which the subdivision was designated.  *See* Tower Law, Section 7.G.4. (". . . the Board may

disapprove an application for any of the following reasons . . . 4) The use or construction of

Wireless Telecommunications Facilities which is contrary to an already stated purpose of a

specific zoning or land use designation.").  Thus, it was unreasonable for the Town Board to

further delay action on Masterpage's application by referring it to the Planning Board, for the

third time, to apply for reconsideration of the subdivision, as it had no authority to do so and

could have instead denied the application, many months earlier, upon learning Masterpage's

proposed use of the site was contrary to the site's recreational use designation.

Further, the record is replete with uncontroverted evidence of the Town Board's

unreasonable delay of plaintiff's application, beginning with the moratorium, which the Town

continued for almost a year after learning Masterpage intended to apply to build a wireless

facility.  The Town Board also repeatedly questioned Masterpage about the justification for the

height of the proposed facility notwithstanding its own consultant's opinion that the height

Masterpage requested, 142', was necessary to provide adequate coverage.  Moreover, after the

public hearing, Masterpage submitted to the Town Board a written response to the issues raised

at the hearing, including the height issue.  Shortly thereafter, the Town Board sent to Masterpage a list of "concerns" raised at the public hearing, most of which Masterpage had already addressed in its previous letter.  The Town offers no explanation for this action.

The record also shows that even if the subdivision issue was resolved, a vote on the application was by no means imminent.  At the same time it instructed Masterpage to return to the Planning Board, the Town Board advised Masterpage that the issue regarding Masterpage's legal access to the site still needed to be resolved, and that the Town Board intended to address the environmental issues.  Masterpage previously submitted to the Town Board documents evidencing its legal access, and had pointed out that there was no evidence to the contrary. Additionally, and as Masterpage had informed the Town, well-settled state law prohibits the denial of a permit for a use allowed by a zoning ordinance because it would be in violation of a matter of private agreement.  *Matter of Friends of the Shawangunks, Inc. v. Knowlton*, 487 N.Y.2d 387 (1985).

As to the environmental issues, and the SEQRA review process, the Town Board had Masterpage's application for nearly two years as of April 2002, but had not taken the first step in reviewing the environmental impact of the facility, despite Shuster's recommendation on September 20, 2001, eight months earlier, that it: (1) obtain an alternative coverage analysis from Masterpage; or (2) approve (a) a conditioned negative declaration, or (b) a positive declaration with the requirement that Masterpage submit a Draft Environmental Impact Statement.  Thus, the Town's further delay of Masterpage's application on these grounds was unreasonable.  Accordingly, as there is no issue of material fact requiring trial, Masterpage is entitled to summary judgment on its unreasonable delay claim.

24

### D.    Remaining Claims

Masterpage also seeks summary judgment on its remaining claims, which include claims that the Town has prohibited Masterpage from providing wireless services to the Town of Olive, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); that the Town's constructive denial of its application was not supported by substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii); that the Town Board's failure to grant Masterpage a special use permit is arbitrary and capricious and not supported by substantial evidence, in violation of Article 78 of the New York Civil Practice Law and Rules and Section 274-a of the New York Town Law; and that defendants' actions have deprived it of its federally protected rights in violation of 42 U.S.C. § 1983.

In view of the Court's disposition of Masterpage's unreasonable delay claim, the Court denies Masterpage summary judgment on its second, third, and fourth causes of action, on the basis that such claims are moot.  In any event, the Court notes that Masterpage's third and fourth causes of action, which are based on the Town's "*de facto* denial" of its application are not ripe for adjudication because the Town has not rendered a final decision.  Finally, Masterpage is not entitled to summary judgment as a matter of law on its § 1983 claim because the Supreme Court has held that a violation of the TCA does not provide a cause of action under § 1983.  *City of Rancho Palos Verdes, California v. Abrams*, 125 S.Ct. 1453, 1462 (2005) ("the TCA - - by providing a judicial remedy different from § 1983 in § 332©)(7) itself - - precluded resort to § 1983.").

### E.    Disposition

The Second Circuit has held that "injunctive relief serves the [TCA's] stated goal of

25

expediting resolution of this type of action," particularly where "remand would serve no useful purpose . . . ." *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999). The Town's persistent and repetitive requests regarding issues previously resolved, tower height and right of access to the site, for instance, and its direction that Masterpage go before the Planning Board three times to resolve the subdivision issue, demonstrates its disregard of clearly established New York law, its own Tower Law, and its failure to move ahead on Masterpage's application within a reasonable period of time. The Town has therefore relinquished its right to seek further review of Masterpage's application. Although the Town has not yet addressed the environmental impact the construction of Masterpage's facility poses, it had two years to address that issue, but failed to take even the first step. Thus, it is unlikely remand would serve any purpose and would further delay Masterpage's application in a swamp of hearings and meetings with no resolution in sight. Accordingly, the Court finds the appropriate remedy is immediate injunctive relief directing the issuance of a special use permit, building permit and any other applicable permits or approvals necessary for Masterpage to construct and operate its 142' facility on South Mountain.

**IV.      CONCLUSION**

For the reasons stated above, it is hereby

ORDERED that Masterpage's motion for summary judgment on Count 1 is GRANTED; and it is further

ORDERED that Count 5 is dismissed *sua sponte*; and it is further

ORDERED that Masterpage's motion for summary judgment is otherwise DENIED; and it is further

ORDERED that Masterpage submit a proposed final judgment of injunction within five (5) business days of the date of this Order; and it is further

ORDERED that in view of the disposition of Count 1 and because defendants have not moved for summary judgment on Counts 2, 3, and 4, Masterpage shall advise the Court within five (5) business days of the date of this Order whether it wishes to proceed on these Counts.

IT IS SO ORDERED.

DATE:   September 28, 2005

Norman A. Mordue
U.S. District Judge